1  BRODSKY & SMITH, LLC
   EVAN J. SMITH (SBN 242352)
2  RYAN P. CARDONA (SBN 302113)
   9595 Wilshire Blvd.
3  Beverly Hills, CA 90212
   Telephone: (877) 534-2590
4  Facsimile: (310) 247-0160

5  PROFY PROMISLOFF & CIARLANTO, P.C.
   JOSEPH M. PROFY
6  DAVID M. PROMISLOFF
   JEFFREY. J. CIARLANTO
7  100 N. 22nd Street, Unit 105
   Philadelphia, PA 19103
8  Telephone: (215) 259-5156
   Facsimile: (215) 600-2642

9
   *Counsel for Plaintiff Charles Blackburn*
10
   [Additional Counsel on Signature Page]
11
                    UNITED STATES DISTRICT COURT
12                NORTHERN DISTRICT OF CALIFORNIA

13  _____

14  CHARLES BLACKBURN, derivatively on     :   Civil Action No.
    behalf of FITBIT, INC.,                :
15                                         :
                            Plaintiff,     :
16                                         :
    v.                                     :
17                                         :
                                           :   VERIFIED SHAREHOLDER DERIVATIVE
18  JAMES PARK, WILLIAM R. ZERELLA,        :   COMPLAINT FOR BREACH OF
    ERIC N. FRIEDMAN, JONATHAN D.          :   FIDUCIARY DUTIES, UNJUST
19  CALLAGHAN, STEVEN MURRAY and           :   ENRICHMENT AND VIOLATIONS OF
    CHRISTOPHER PAISLEY,                   :   SECTION 14(A) OF THE SECURITIES
20                                         :   EXCHANGE ACT OF 1934
                            Defendants,    :
21                                         :
    and                                    :
22                                         :   DEMAND FOR JURY TRIAL
    FITBIT, INC.,                          :
23                                         :
                     Nominal Defendant.    :
24                                         :
                                           :
25                                         :
    _____
26

27

28
                                    - 1 -
    VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST
    ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

1

2       1.     Plaintiff Charles Blackburn ("Plaintiff"), by and through his undersigned attorneys,

3 hereby submits this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duties,

4 Unjust Enrichment and violations of the Securities Exchange Act of 1934 (the "Complaint") for the

5 benefit of nominal defendant Fitbit, Inc. ("Fitbit" or the "Company") against certain current and/or

6 former members of its Board of Directors (the "Board") and executive officers, seeking to remedy

7 the defendants' breaches of fiduciary duties and unjust enrichment from June 2015 through the

8 present (the "Relevant Period").[1]

9 <div align="center">**NATURE OF THE ACTION**</div>

10       2.     According to its public filings, Fitbit manufactures and provides wearable fitness-

11 tracking devices worldwide.  Its products purport to monitor a user's fitness level by tracking daily

12 activity statistics, such as steps taken, distance traveled, calories burned, stairs climbed, and time

13 spent in sleep.

14       3.     Before October 2014, Fitbit's devices calculated these activity statistics solely from

15 data from sensors that detected only simple movements, such as accelerometers and altimeters.

16       4.     In October 2014, Fitbit announced its new "proprietary PurePulse™ optical heart-rate

17 technology," which purported to "provide[] continuous and automatic wrist-based heart rate tracking,

18 without an uncomfortable chest strap."

19       5.     Heart-rate data can be extremely useful.  According to Fitbit's website, athletes can

20

---

21 [1] While Plaintiff and his counsel have conducted their own, independent investigation, many of the
22 facts and allegations contained herein appear in the Amended Complaint for Violations of the Federal
Securities Law (the "Securities Complaint") filed against the Company and certain of its officers
23 related to many of the allegations contained herein.  *See Brian H. Robb v. Fitbit Inc.*, *et al.*, No. 16-
cv-00151-SI (N.D.C.A., filed July 1, 2016) (the "Securities Action").  The Securities Action asserted
24 claims under the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of
1933 (the "Securities Act").  As discussed in detail below, on October 26, 2016, the Hon. Susan Illston
25 ("Judge Illston") of the United States District Court for the Northern District of California (the
"Securities Court") denied the defendants' Motion to Dismiss the Securities Complaint (the
26 "Securities Complaint") in the Securities Action (the "Securities Motion"), and issued an opinion
27 detailing her analysis (the "Securities Order").

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST
ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

use such real-time heart-rate data to "[c]heck heart rate at a glance to gauge your effort and adjust workouts on the spot" and "[s]et a target heart rate zone to ensure you're pushing yourself hard enough, but not overtraining."  Moreover, a device with heart-rate data can calculate calorie burn much more precisely than a device relying solely on accelerometers and altimeters.

6.     Fitbit's revenues grew rapidly in 2015, fueled primarily by sales of its new products featuring PurePulse technology.

7.     On or about June 18, 2015, Fitbit (under the defendants' direction and on their watch) completed its initial public offering (the "IPO"), raising approximately $416 million.

8.     However, in the IPO, and for a long time afterward, the defendants made materially false and/or misleading statements concerning the accuracy of the Company's proprietary PurePulse heart-rate monitoring technology.  Specifically, the defendants falsely claimed that Fitbit's devices could provide consistently accurate heart-rate readings during exercise, including through repeated claims in product advertising and in public statements that "Every Beat Counts" and that the devices allowed users to "Know Your Heart."  The defendants portrayed Fitbit's proprietary heartrate monitoring technology as a major competitive advantage for the Company, particularly with respect to Fitbit's ability to market its products to athletes seeking to maximize their performance.

9.     However, contrary to the defendants' representations, Fitbit's PurePulse heart-rate monitoring technology was highly inaccurate.  Importantly, the defendants had expressly marketed Fitbit's devices with heart-rate monitoring for activity and fitness, including by advertising their use during high-intensity workouts, including pushups, jump-rope, cycling, and dancing.  But in fact, during these activities, Fitbit's devices were so inaccurate about users' heart rates as to be useless at best, and even potentially dangerous to any user who relied on a Fitbit device to "Set a target heart rate zone to ensure you're pushing yourself hard enough, but not overtraining," as the defendants caused Fitbit to advertise.

10.    While Fitbit's stock price was artificially inflated due to the defendants' false statements and material omissions, certain of the defendants named herein, including a majority of the members of the Board, sold their personally held or controlled shares of Fitbit stock, reaping

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST
ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

proceeds of $386 million.  Further, because a majority of the Board engaged in the illicit insider trading detailed herein, any demand upon the Board is excused on this basis alone.

11.     Beginning on January 5, 2016 and continuing until May 19, 2016, the truth about the inaccuracy of Fitbit's heart-rate tracking devices was slowly revealed in a consumer class action lawsuit, subsequent reporting, and finally a comprehensive study of Fitbit devices' heart-rate tracking accuracy.  After these disastrous revelations, Fitbit's stock price fell from a high of $30.96 per share on January 5, 2016 to close at $13.99 per share on May 19, 2016.  This represents an overall loss of 54.8% of the value of Fitbit's stock.  Additionally, the Company's share price has not recovered.

12.     As a result of the defendants' false and/or misleading statements, Fitbit securities traded at inflated prices.  After the disclosure of information correcting the defendants' false and/or misleading statements, Fitbit's stock suffered a precipitous decline losing 54.8% of its market value.

13.     Additionally, as a result of defendants' breaches, beginning in January 2016, the Company became the subject of the Securities Action, which is based on the same set of facts alleged herein.  The Class Period in the Securities Action (which was expanded by the Securities Complaint) is defined as June 18, 2015 through May 19, 2016.  Importantly, the defendants in this action are all named defendants in the Securities Action.

14.     On October 26, 2016, Judge Illston of the Securities Court denied the defendants' Motion to Dismiss (the "Securities Motion").  Judge Illston's Securities Order held, *inter alia*, that the plaintiff to the Securities Action had sufficiently pled that defendants were engaged in a scheme to defraud Fitbit and Fitbit's shareholders.  In particular, Judge Illston found that the plaintiffs in the Securities Action "have alleged factual misstatements made by Fitbit both before and after the IPO and in the IPO Prospectus."  In addition, the Securities Order held, in pertinent part:

> In sum, plaintiffs have pointed to numerous statements in which Fitbit claimed that its devices were able to track heart rates and could do so with a high degree of accuracy. Relying on multiple and varying sources, plaintiffs allege that the devices could not do this.  Whether the statements were in fact false is not appropriate for resolution on a motion to dismiss.  At this stage, plaintiffs have sufficiently alleged a material misrepresentation or omission by the defendant.

15.     Significantly, Judge Illston found that the actionable statements alleged in the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

Securities Action met the heightened pleading standards imposed upon the plaintiffs to the Securities Action by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"),[2] which are as stringent, if not more stringent, than any heightened pleading requirement under Delaware law.

16.     Additionally, and critically for purposes of this action, in the Securities Action, Judge Illston sustained the plaintiffs' Section 11 claim brought pursuant to the Securities Act of 1933 against a majority of the members of the current Board for allegedly false and misleading statements contained in the Company's IPO offering documents.

17.     Because a majority of the members of the Board are each named defendants in the Securities Action and have had claims for violations of the federal securities laws sustained against them, they are incapable of independently considering a demand.  Specifically, given their potential direct culpability and/or exposure in that action, it is impossible for defendants Park, Friedman, Callaghan, Murray and Paisley (defined herein), who comprise a majority of the Board, to consider a demand impartially regarding this action, which is based on the same set of factually allegations. Accordingly, as alleged below, any demand upon the Board is independently excused on this basis alone.

18.     Accordingly, as a result of defendants' breaches and other misconduct set forth herein, the Company has suffered and continues to suffer damages.  Further, for the reasons discussed herein, any demand upon the Board was futile and, thus, this action should be allowed to proceed.

---

[2]   The PSLRA imposes significantly heightened pleading standards in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter.  *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1084 (9th Cir. 2002).  To meet these heightened standards, a complaint must specify each statement alleged to have been misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed.  *Id.* at 1085.  With respect to pleading scienter, the PSLRA requires plaintiffs to state with particularity facts giving rise to a strong inference that a defendant acted with the required state of mind.  15 U.S.C. § 78-u4(b)(2).  The inference of scienter must be more than merely reasonable – it must be cogent and compelling, meaning that a complaint will only survive if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.  *Tellabs, Inc. v. Makor Issue & Rights, Ltd.,* 127 S. Ct. 2499, 2502 (2007).  Notably, the PSLRA's heightened pleading standards do not apply to the instant shareholder derivative action.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

**JURISDICTION AND VENUE**

19.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

20.     Venue is proper in this district because Fitbit conducts business and maintains its principal executive offices this district.  Upon information and belief, one or more of the Defendants resides in this district.  Further, Fitbit engages in numerous activities and conducts business here, which had an effect in this district.

**THE PARTIES**

21.     Plaintiff is a current shareholder of Fitbit and has continuously held Fitbit stock since June 18, 2015.[3]

22.     Nominal defendant Fitbit is a Delaware corporation with its principal executive offices located at 405 Howard Street, San Francisco, CA 94105.

23.     Defendant James Park ("Park"), a co-founder of Fitbit, has served as a director of the Company since March 2007, as Chairman since May 2015, and as President and Chief Executive Officer ("CEO") since September 2007.   Defendant Park signed the false and misleading IPO Registration Statement and Secondary Offering Registration Statement.

24.     Defendant William R. Zerella ("Zerella") has served as the Company's Chief Financial Officer ("CFO") since June 2014.  Defendant Zerella signed the false and misleading IPO Registration Statement and Secondary Offering Registration Statement.

25.     Defendant Eric N. Friedman ("Friedman"), a co-founder of Fitbit, has served as a director of the Company since March 2007, and currently serves as the Company's Chief Technology Officer ("CTO").  Defendant Friedman signed the false and misleading IPO Registration Statement

---

[3] Plaintiff purchased his shares in the IPO through Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), who acted as an underwriter in connection with the IPO.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

and Secondary Offering Registration Statement.

26.     Defendant Jonathan D. Callaghan ("Callaghan") has served as a director of the Company since September 2008.   Defendant Callaghan signed the false and misleading IPO Registration Statement and Secondary Offering Registration Statement.

27.     Defendant Steven Murray ("Murray") has served as a director of the Company since June 2013. Defendant Murray signed the false and misleading IPO Registration Statement and Secondary Offering Registration Statement.  In addition, Murray serves as a member of the Board's Audit Committee (the "Audit Committee").

28.     Defendant Christopher Paisley ("Paisley") has served as a director of the Company since January 2015. Defendant Paisley signed the false and misleading IPO Registration Statement and Secondary Offering Registration Statement.  In addition, Paisley serves as Chair of the Audit Committee.

29.     Collectively, defendants Park, Zerella, Friedman, Callaghan, Murray and Paisley shall be referred to herein as "Defendants."

30.     Collectively, defendants Murray and Paisley shall be referred to as the "Audit Committee Defendants."

31.     Collectively, defendants Park, Zerella, Friedman, Callaghan and Murray shall be referred to as the "Insider Selling Defendants."

**DEFENDANTS' DUTIES**

32.     By reason of their positions as officers, directors, and/or fiduciaries of Fitbit and because of their ability to control the business and corporate affairs of Fitbit and its subsidiaries, Defendants owed Fitbit and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Fitbit in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Fitbit and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Fitbit and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

1  of the Company and in the use and preservation of its property and assets, and the highest obligations

2  of fair dealing.

3      33.     Defendants, because of their positions of control and authority as directors and/or

4  officers of Fitbit, were able to and did, directly and/or indirectly, exercise control over the wrongful

5  acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions

6  with Fitbit, each of the Defendants had knowledge of material non-public information regarding the

7  Company.

8      34.     To discharge their duties, the officers and directors of Fitbit were required to exercise

9  reasonable and prudent supervision over the management, policies, practices and controls of the

10  Company.  By virtue of such duties, the officers and directors of Fitbit were required to, among other

11  things:

12          a.  Exercise good faith to ensure that the affairs of the Company were conducted in

13              an efficient, business-like manner so as to make it possible to provide the highest

14              quality performance of their business;

15          b.  Exercise good faith to ensure that the Company was operated in a diligent, honest

16              and prudent manner and complied with all applicable federal and state laws, rules,

17              regulations and requirements, and all contractual obligations, including acting only

18              within the scope of its legal authority; and

19          c.  When put on notice of problems with the Company's business practices and

20              operations, exercise good faith in taking appropriate action to correct the

21              misconduct and prevent its recurrence.

22      35.     Additionally, the Company's Code of Business Conduct and Ethics for employees (the

23  "Employee Code of Ethics"), which expressly applies to at least defendants Park, Zerella and

24  Friedman, states the following, in relevant part:

25          Legal compliance is only a part of the Company's ethical responsibility, however, and
26          should be viewed as the minimum acceptable standard of conduct. The Company
              strives to act with the utmost integrity, not just in its most important corporate
27          decisions, but also in the actions taken every day by its employees. Ethical conduct is

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST
ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

a high ideal, but often just means exercising common sense and sound judgment. Acting ethically will help the Company become a better company, a better commercial partner for other companies, and a better corporate citizen.

*     *     *

Insider Trading In the course of doing business for the Company, or in discussions with one of its customers, partners, service providers, distributors or suppliers, the Company's employees may become aware of material non-public information about the Company or another organization. Information is considered "material" if it might be used by an investor to make a decision to trade in the securities of the company. Employees may only use such information for the purpose of conducting the Company's business. Federal law and Company policy prohibit employees, directly or indirectly through their families or others, from purchasing or selling the Company's stock while in the possession of material, non-public information concerning the Company. This same prohibition applies to trading in the stock of other publicly held companies on the basis of material, non-public information. If an employee is considering buying or selling a stock because of inside information he or she possesses, he or she should assume that such information is material. It is also important for the employee to keep in mind that if any trade he or she makes becomes the subject of an investigation by the government, the trade will be viewed after-the-fact with the benefit of hindsight. Consequently, employees should always carefully consider how their trades would look from this perspective. If an employee's family or friends ask for advice about buying or selling the Company's stock, the employee should not provide it. Federal law and Company policy also prohibit the employee from "tipping" family or friends regarding material, non-public information that the employee learns about the Company or any other publicly traded company in the course of employment. The same penalties apply, regardless of whether the employee derives any benefit from the trade. Because of the sensitive nature of and severe penalties associated with insider trading and tipping, employees must exercise the utmost care when in possession of material non-public information. All employees shall follow the guidelines and policies on securities trading issued by Company and should review the Company's Insider Trading Policy, as may be in effect.

*     *     *

Maintenance of Corporate Books, Records and Accounts; Financial Integrity; Public Reporting The Company strives to maintain complete integrity of its books and records and public disclosure. The Company's corporate and business records, including all supporting entries to its books of account, must be completed honestly, accurately and intelligibly. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting its obligations to customers, suppliers, creditors, employees and others with whom the Company does business. The Company depends on its books, records and accounts accurately and fairly reflecting, in reasonable detail, its assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. To help ensure the integrity of its books and records and public disclosure, the Company

- 9 -

requires that:

- No entry be made in the Company's books and records that is intentionally false or misleading;

- Transactions be supported by appropriate documentation;

- The terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records;

- Employees comply with the Company's system of internal controls and be held accountable for their entries;

- Any off-balance sheet arrangements of the Company be clearly and appropriately disclosed; • No cash or other assets be maintained for any purpose in any unrecorded or "off-the books" fund;

- Assets and liabilities of the Company shall be recognized and stated in accordance with the Company's standard practices and generally accepted accounting principles ("GAAP"); and

- Records be retained or destroyed according to the Company's records retention policy. The Company's disclosure controls and procedures are designed to help ensure that the Company's public disclosures are full, fair and accurate, that they fairly present its financial condition and results of operations, and that they are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way to preparing or verifying these reports should adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all of the information about the Company that is required by law and would be important to enable investors to understand the Company's business and its attendant risks.

In particular:

- no employee may take or authorize any action that would cause the Company's financial records or financial disclosures to fail to comply with GAAP, the rules and regulations of the Securities and Exchange Commission ("SEC") or other applicable laws, rules and regulations;

- all employees must cooperate fully with the Company's finance department, as well as the Company's independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's books and records, as well as its reports filed with the SEC, are accurate and complete; and

• no employee shall knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or any third party or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects. If any employee becomes aware that the Company's public disclosures are not full, fair and accurate, or if any employee becomes aware of a transaction or development that he or she believes may require disclosure, he or she should report the matter immediately to the Compliance Officer.

\*        \*        \*

Conduct of Senior Financial Personnel The Company's Finance Department has a special responsibility to promote integrity throughout the organization, with responsibilities to stakeholders both inside and outside of the Company. As such, the Chief Executive Officer, Chief Financial Officer and senior finance department personnel must adhere to the following ethical principles and accept the obligation to foster a culture throughout the Company as a whole that ensures the accurate and timely reporting of the Company's financial results and condition. Because of this special role, the Company requires that the Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, controller and any other persons performing similar functions ("Senior Financial Employees"):

• Act with honesty and integrity and use due care and diligence in performing his or her responsibilities to the Company.

• Avoid situations that represent actual or apparent conflicts of interest with his or her responsibilities to Company, and disclose promptly to the Audit Committee of the Board ("Audit Committee"), any transaction or personal or professional relationship that reasonably could be expected to give rise to such an actual or apparent conflict. Without limiting the foregoing, and for the sake of avoiding an implication of impropriety, Senior Financial Employees shall not:

• accept any material gift or other gratuitous benefit from a customer, distributor, supplier, service provider or any vendor of products or services, including professional services, to the Company (this prohibition is not intended to preclude ordinary course entertainment or similar social events);

• except with the approval of the disinterested members of the Audit Committee, directly invest in any privately-held company that is a customer, partner, service provider, distributor, supplier or vendor of the Company where the Senior Financial Employee, either directly or through people in his or her chain of command, has responsibility or ability to affect or implement the Company's relationship with the other company; or

- maintain more than a passive investment of greater that 1% of the outstanding shares of a public company that is a customer, partner, service provider, distributor, supplier or vendor of the Company.

- Provide constituents with information that is accurate, complete, objective, relevant, timely and understandable, including information for inclusion in the Company's submissions to governmental agencies or in public statements.

- Comply with applicable laws, rules, and regulations of federal, state and local governments, and of any applicable public or private regulatory and listing authorities.

- Achieve responsible use of and control over all assets and resources entrusted to each Senior Financial Employee.

36. Additionally, the Company's Code of Business Conduct and Ethics for directors (the "Director Code of Ethics"),[4] which expressly applies to at least defendants Park, Friedman, Callaghan, Murray and Paisley, states the following:

Legal Compliance
Every director must always obey the law while performing his or her duties to the Company as a director. The Company's success depends upon each director operating within legal guidelines and cooperating with authorities. It is essential that each director knows and understands the legal and regulatory requirements that apply to the Company's business and to his or her responsibility as a director. While a director is not expected to have complete mastery of these laws, rules and regulations, directors are expected to be able to recognize situations that require consultation with others to determine the appropriate course of action. If a director has a question in the area of legal compliance, he or she should approach the Chair (or, in the case of the Chair, the Company's General Counsel) immediately. 2. Insider Trading Every director is prohibited from using "inside" or material nonpublic information about the Company, or about companies with which the Company does business, in connection with buying or selling the Company's or such other companies' securities, including "tipping" others who might make an investment decision on the basis of this information. It is illegal, and it is a violation of this Code and other Company policies, to tip or to trade on inside information. Directors are not permitted to use or share inside information for stock trading purposes or for any other purpose except to conduct Company business. Directors must exercise the utmost care when in possession of material nonpublic information. The Company's Insider Trading Policy (the "Insider Trading Policy") provides guidance on the types of information that might be nonpublic and

---

[4] Collectively, the Employee Code of Ethics and the Director Code of Ethics shall be referred to as the "Codes."

material for these purposes, and guidelines on when and how a director may purchase or sell shares of Company stock or other Company securities.

\*        \*        \*

Financial Integrity; Public Reporting
The Company's disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the United States Securities and Exchange Commission (the "SEC") and other public disclosures are complete, fair and accurate, fairly present the Company's financial condition and results of operations and are timely and understandable. In connection with the preparation of the financial and other disclosures that the Company makes to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:

• Act honestly, ethically, and with integrity;

• Comply with this Code;

• Endeavor to ensure complete, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC;

• Raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;

• Act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and

• Comply with the Company's disclosure controls and procedures and internal controls over financial reporting. If a director becomes aware that the Company's public disclosures are not complete, fair and accurate, or if the director becomes aware of a transaction or development that the director believes may require disclosure, the director should report the matter immediately to the Chair (or, in the case of the Chair, the Company's General Counsel).

37.    Pursuant to the terms of the Audit Committee's Charter, the Audit Committee Defendants were responsible for assisting the Board in the oversight of, *inter alia,* the following:

- the Company's accounting and financial reporting processes, including its audits and the integrity of the Company's financial statements;
- compliance by the Company with legal and regulatory requirements;
- the qualifications, independence and performance of the Company's

- 13 -

independent auditors (the "Independent Auditors");

- the performance of the Company's internal audit function; and
- the preparation of the committee report as required by the rules of the United States Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

## SUBSTANTIVE ALLEGATIONS

### A.  History of the Company

38.    Founded in 2007, Fitbit manufactures and provides wearable fitness-tracking devices. Its products purport to monitor a user's fitness level by tracking daily activity statistics, such as steps taken, distance traveled, calories burned, stairs climbed, and sleep duration and quality.   As of December 31, 2015, Fitbit had 1,101 employees.

39.    Fitbit has grown rapidly since its founding, generating $14.5 million in revenue in 2011, $76.4 million in 2012, $271.1 million in 2013, $745.4 million in 2014, and $1.858 billion in 2015.

40.    Before October 2014, Fitbit's activity trackers were essentially pedometers aimed at "everyday" users.  Such products included: a. The Fitbit Zip, an "entry-level wireless activity tracker that allows users to track the most important daily activity statistics such as steps, distance, calories burned, and active minutes," for $59.95; b. The Fitbit Flex, a "wristband-style tracker, with a sleek and stylish design, that tracks steps, distance, calories burned, active minutes, and sleep," for $99.95; and c. The Fitbit One, "a more advanced clippable wireless tracker that tracks stairs climbed and sleep in addition to daily steps, distance, calories burned, and active minutes," for $99.95.

41.    The Zip and Flex calculate a user's daily activity statistics from data provided by a single sensor: a 3-axis accelerometer, which measures acceleration.  The "more advanced" Fitbit One uses two sensors: the accelerometer and an altimeter.

### B.    Defendants Cause the Company to Conduct the IPO and the Secondary Offering

42.    On May 7, 2015, Defendants caused Fitbit to file a registration statement on Form S-1 in connection with the IPO.  The registration statement was subsequently amended several times, with the final amended registration statement filed on Form S-1/A on June 16, 2015 (collectively, the "IPO Registration Statement").

- 14 -

43.     On June 17, 2015, the SEC declared the IPO Registration Statement effective.

44.     The IPO Registration Statement contained a preliminary prospectus.    The final prospectus (the "IPO Prospectus") was filed on June 18, 2015.

45.     On or about June 18, 2015, the Company completed its IPO.    The Company sold 22,387,500 shares and certain other selling stockholders (including defendants Park, Friedman, Callaghan, and Murray) collectively sold 19,673,750 shares of Fitbit stock.   The Company raised net proceeds of approximately $416 million.

46.     On November 2, 2015, Defendants caused Fitbit to file a registration statement on Form S-1 in connection with its secondary public offering (the "Secondary Offering").   The registration statement was subsequently amended, with the final amended registration statement filed on Form S-1/A on November 9, 2015 (collectively, the "Secondary Offering Registration Statement").   On November 12, 2015, the SEC declared the Secondary Offering Registration Statement effective.

47.     The Secondary Offering Registration Statement contained a preliminary prospectus. The final prospectus (the "Secondary Offering Prospectus") was filed on November 13, 2015.

48.     On or about November 13, 2015, the Company completed its Secondary Offering. The Company sold 3,000,000 shares and certain other selling stockholders (including defendants Park, Zerella, Friedman, Callaghan, and Murray) collectively sold 14,000,000 shares of Fitbit stock.   The Company raised net proceeds of approximately $82.7 million.

**C.      Overview of Defendants' Illicit Scheme Regarding PurePulse Technology**

49.     In an October 27, 2014 press release, Fitbit announced a new feature: its new "proprietary PurePulseTM optical heart-rate technology," which purported to "provide[] continuous and automatic wrist-based heart rate tracking, without an uncomfortable chest strap." PurePulse uses pulses of green light to detect blood flow in capillaries in the user's skin, from which "finely tuned algorithms" calculate the user's purported heart rate.

47.      Fitbit repeatedly represented that PurePulse was the result of extensive research and development.

48.    For instance, in a March 27, 2015 article in *The Washington Post*, defendant Park stated that PurePulse "was the result of three years of R&D effort."

49.    Additionally, in a conference call with Fitbit investors and stock market analysts on August 5, 2015, defendant Park stated "the PurePulse technology in Charge HR and Surge took many, many years to develop and perfect.  The key thing for us is we will only launch products when we feel that they're ready."

50.    Further, Fitbit's October 2014 press release stated that "Fitbit consults with scientific experts and also tests its products with independent labs to ensure they meet stringent standards.  This year Fitbit also created the first-ever Scientific Advisory Board for wearables that includes leading, certified dermatologists to help enhance Fitbit's testing protocols and develop product wear and care guidelines."

51.    The IPO Prospectus described Fitbit's competitive advantages as its "leading market position and global brand," its "advanced and proprietary sensor technologies," and its "singular focus on health and fitness, which has driven us to dedicate significant resources to developing proprietary sensors, algorithms, and software to ensure that our products, which are specifically oriented towards health and fitness, have accurate measurements, insightful analytics, compact sizes, durability, and long battery lives."

50.    Fitbit's October 2014 press release also announced two new products featuring PurePulse technology: a. Fitbit Charge HR, "a wireless heart rate and activity wristband" that "tracks steps, distance, calories burned, active minutes, floors climbed, and sleep" and "also includes our proprietary PurePulse heart rate tracking technology," for $149.95; and b. Fitbit Surge, a "fitness 'super watch' that combines popular features of a GPS watch, heart rate tracker, activity tracker, and smartwatch," for $249.95.

51.    Defendants actively marketed the Charge HR and Surge specifically towards athletes and more active users, who are often willing to pay higher prices.

52.    Fitbit's website labeled the Zip, One, Flex, and Charge as marketed towards "everyday" users, whereas the Charge HR is for "active" users and the Surge is for "performance" users.

- 16 -

53.    Fitbit's October 2014 press release described the Charge HR as "designed for more active users who are dedicated to staying fit and want a full picture of their health—in and out of the gym."

54.    The IPO Prospectus describes "active users" as follows:

> Active users exercise regularly to reach their fitness goals through activities such as running, using cardio equipment, and playing sports recreationally. As a result, these users are often interested in monitoring exercise intensity through heart rate tracking in addition to activity tracking. We primarily market the Fitbit Charge HR to Active users.

55.    Fitbit's October 2014 press release described the Surge as "designed for peak performance" and "ideal for users committed to training, dedicated to health and consistently looking to maximize progress."

56.    The IPO Prospectus describes "performance users" as follows:

> Performance users train regularly to improve their performance and achieve their personal bests. These users participate in endurance sports and fitness activities with higher intensity and longer duration, such as interval or distance running and cycling, and thrive on personal improvement and competition. Accordingly, these users are interested in GPS tracking of speed, distance, and exercise routes, in addition to heart rate and daily activity tracking. We primarily market the Fitbit Surge to Performance users.

57.    As market commentators noted, PurePulse was an essential part of Fitbit's appeal among these users.  An article in *PC World* stated that, precisely because of the new heart-rate monitoring technology, "Fitbit is aiming [the Charge HR] at regular exercisers who might want to set target heart rates during workouts, get more accurate calorie burn estimates, and see details on resting heart rate and heart rate trends."[5]

58.    Thus, Fitbit's advertising (under Defendants' direction and on their watch) for the Charge HR and Surge focused heavily on their heart-rate monitoring features, with slogans including "Get More Benefits with Every Beat" and "Every Beat Counts."

---

[5] *See* Jared Newman, Fitbit gets fancier with Charge activity trackers, fitness-focused Surge 'super watch', PCWorld (Oct. 27, 2014 6:10 AM), available at: http://www.pcworld.com/article/2838937/fitbit-gets-fancier-with-charge-fitness-trackers-surge-super-watch.html.

**D.     Defendants' Illicit Scheme Initially Works and Fitbit's Sales Grow**

59.     The Charge HR and Surge initially sold very quickly, driving Fitbit's revenues to grow rapidly in 2015.

60.     As the IPO Prospectus noted, the Charge, Charge HR, and Surge were "the primary drivers of our revenue growth in the first quarter of 2015," in large part because the Surge was the "highest selling GPS fitness watch in the United States in the first quarter of 2015, with a 61% share of the U.S. GPS fitness watch market, by dollars, up from 3% in 2014."

61.     This was further confirmed in Fitbit's August 5, 2015 conference call with investors and analysts to discuss second quarter results, in which defendant Zerella stated "Our second-quarter revenue growth was driven by our newest products, Charge, Charge HR, and Surge, which collectively accounted for approximately 78% of our revenue."

62.     On the second quarter earnings call, defendant Zerella responded to an analyst's question as follows:

> [Analyst]: The mix of the newer products, the Charge HR, Surge being 78% this quarter, you expect that mix to be relatively constant as the year progresses?

> [Zerella]: Yes, Tavis, obviously they already dominate our revenue streams. We would expect a similar mix through the second half.

63.     On Fitbit's November 2, 2015 conference call with investors and analysts to discuss third quarter results, defendant Park stated "our new products, Charge, Charge HR, and Surge, obviously represents roughly almost 80% of our business at this point in time."

64.     On the third quarter earnings call, an analyst asked whether Fitbit's revenues would continue to come primarily from Charge HR and Surge.  Defendant Park responded, "I think probably the safest bet would be to say we're going to stay within the range that we've been over the last couple of quarters for a while."

65.     In a November 3, 2015 interview for *Bloomberg Radio* on a segment titled "The Bloomberg Advantage," defendant Park stated that:

> [O]ur Pure Pulse optical heart rate technology, which is in our Charge HR and Surge devices took over three years to develop, and so, you know, that's resulted in two products which are incredible leaders in the categories. So Fitbit Charge HR is a

- 18 -

number one wearable activity tracking device in the market today and Fitbit Surge is the number one GPS fitness watch, so I think that's a great example of how our technology development has resulted in really break-through products. Ultimately, driven by sales of these products with PurePulse technology, Fitbit's revenues reached a total of $1.858 billion in 2015, compared to $745.4 million in 2014.

66.     Because heart-rate monitoring was the key feature of Fitbit's most important products, the accuracy of that heart-rate monitoring was thus crucial to Fitbit's success as a business.

67.     Analysts and market commentators confirmed the importance of the accuracy of PurePulse to Fitbit's business.  For example, on June 30, 2015, a stock analyst report by RBC Capital Markets discussed a survey in which respondents were asked "What are the features that are important to you in your activity/fitness tracker?"  Heart-rate monitoring was the second most frequent response.

68.     Accordingly, the accuracy of PurePulse was essential to Fitbit's success as a business and was a component of its core operations.

**E.     The Fitbit Consumer Class Action is Filed**

69.     The truth began to emerge on January 5, 2016, when a class action lawsuit was filed against Fitbit in the U.S. District Court for the Northern District of California, alleging that the heart-rate monitoring systems on the Company's Charge HR and Surge devices were dangerously inaccurate and posed serious health risks to users.  *See McLellan et al. v. Fitbit, Inc.*, 3:16-cv-00036 (N.D. Cal. Jan. 5, 2016) (the "Fitbit Consumer Class Action").

70.     The claims against Fitbit in the Fitbit Consumer Class Action included violations of California's Unfair Competition Law and Consumers Legal Remedies Act, common law fraud, and unjust enrichment.   Specifically, the complaint alleged that Fitbit's devices significantly undercounted users' heart rates, particularly during exercise, which created a risk of life-threatening overexertion.  For instance, the complaint alleged, in pertinent part:

> At an intense personal training session in mid-June 2015, Plaintiff['s] personal trainer manually recorded her heart rate, which was 160 beats per minute ("bpm"). In stark contrast, her Charge HR indicated her heart rate was only 82 bpm. Plaintiff Black was approaching the maximum recommended heart rate for her age, and if she had continued to rely on her inaccurate PurePulse Tracker, she may well have exceeded it, thereby jeopardizing her health and safety.

71.     In addition to the risk of life-threatening overexertion, the Fitbit Consumer Class Action more generally alleged that many consumers "have experienced—and testing confirms—that

the PurePulse Trackers consistently mis-record heart rates by a very significant margin, particularly during exercise."  This was contrary to Fitbit's advertising (under Defendants' direction and on their watch), which promised users that the devices allowed users to "accurately track calorie burn all day," "check real-time heart rate" and "use simplified heart rate zones to tailor your workouts on the spot" or "see when your health is improving by analyzing your all-day and resting heart rate trends."

72.    On January 5, 2016, Fitbit's stock closed at $24.30 per share, down from a high of $30.96 per share earlier that same day.

73.    On January 5, 2016, a number of online media sources reported on the Fitbit Consumer Class Action and the decline in Fitbit's stock price.  In a stock analyst report by SunTrust Robinson Humphrey dated January 6, 2016 the analysts attributed the January 5 stock drop in part to the class action lawsuit.

74.    That same day, a number of mass media sources reported on the lawsuit, including *Bloomberg*, *Fortune*, and *Reuters*.  One media report published on January 6 quotes a stock analyst with Pacific Crest Securities as stating that the Fitbit Consumer Class Action lawsuit contributed to a "perfect storm" for Fitbit.

75.    On January 6, 2016, the first full day of stock trading after the filing of the Fitbit Consumer Class Action, Fitbit's stock dropped further to close at $22.90 per share, down from the previous day's close of $24.30 per share, a one day decline of 5.8%.

76.    On January 7, 2016 Fitbit's stock continued to decline in value as the markets absorbed the false and misleading nature of the Defendants' prior statements concerning the accuracy of Fitbit heart-rate tracking.  Further reporting published on January 7 focused on the Fitbit Consumer Class Action, and linked this lawsuit to the continuing decline in Fitbit's stock price.

77.    For example, a January 7, 2016 article stated in pertinent part: "Fitbit (FIT) stock is tanking 9.39% to $20.75 on heavy volume in afternoon trading on Thursday as users sue the health and fitness products provider over the accuracy of its heart rate monitors."

78.    On January 7, 2016, Fitbit's stock dropped from the previous day's close of $22.90 per share to a low of $20.25 per share, a decrease of 11.5%.  From its high price of $30.96 per share

on January 5, this represented a loss of 34.6% of the value of Fitbit's stock over the two days following the filing of the Fitbit Consumer Class Action.

**F.    The Truth Continues to Emerge**

79.    From January 2016 through May 2016, additional reports confirmed the allegations set forth in the Fitbit Consumer Class Action, and Fitbit's stock price generally continued to decline. Temporarily reversing this downward trend, Fitbit's stock closed at $18.81 per share on January 22, up 3.6% from the previous day's close.  On January 22, 2016 *Consumer Reports* had published an article giving Fitbit devices' heart-rate tracking a favorable review.

80.    After the close of trading on February 22, 2016, Indianapolis television news channel WTHR posted the results of a study to its website under the title "Sometimes your fitness tracker lies – a lot."  The study was performed by Dr. Alex Montoye, Assistant Professor of Clinical Exercise Physiology at Ball State University, and found that the Charge HR had an average heart-rate error of 14%--which it described as "bordering on dangerous."  For example, the Charge HR reported a heart rate of 68 for a user whose heart rate was actually 91.  The article noted that "[c]alculating a heart rate that's off by 20 or 30 beats per minute can be dangerous -- especially for people at high risk of heart disease."

81.    On the next trading day, February 23, Fitbit's stock price plunged 27.9% to close at $13.08 per share.

82.    Finally, on May 19, 2016, the complete truth was revealed regarding the inaccuracy of Fitbit's heart-rate tracking.  On that date, the Amended Consolidated Master Class Action Complaint was filed in the Fitbit Consumer Class Action (the "Consumer Class Action Amended Complaint").  The Consumer Class Action Amended Complaint contained the results of the most thorough study of Fitbit heart-rate monitors performed to date.  The study and a corresponding press release were also distributed online on May 19, 2016.

83.    The study, performed by researchers at California State Polytechnic University, Pomona, found that Fitbit devices incorrectly measured heart rate by an average of 20 beats per minute during moderate to high exercise and concluded that Fitbit devices "do not accurately measure a

user's heart rate, particularly during moderate to high intensity exercise, and cannot be used to provide a meaningful estimate of a user's heart rate."

84.     The Consumer Class Action Amended Complaint further alleged that Fitbit had been unable to provide any studies to validate its representations about the accuracy of its heart-rate monitoring: Fitbit has repeatedly told the press that "our team has performed and continues to perform internal studies to validate our products' performance." Yet Fitbit has not referenced a single, specific study which it contends in fact validates its products' performance, nor has it (upon information and belief) disclosed the details of any study.

85.     Following publication of this news, Fitbit's stock again lost value on May 19, 2016, closing at $13.99 per share, down from the previous day's closing price of $14.13 per share (a drop of 1.0%).

86.     As a result of Defendants' false and misleading statements about the accuracy of Fitbit's heart-rate tracking, Fitbit shares traded at inflated prices. However, after the inaccuracy of Fitbit's heart-rate tracking was revealed by the Fitbit Consumer Class Action, subsequent reporting, and finally a comprehensive study, Fitbit's stock suffered a precipitous decline, losing 54.8% of its market value.

## G.     The Specific False and Misleading Statements Defendants Caused the Company to Issue During the Relevant Period

87.     The IPO Prospectus, filed as part of the IPO Registration Statement, contained material omissions and numerous statements that were materially false and misleading, because they led investors to believe that Fitbit's heart-rate tracking devices had "highly accurate measurements" at all times, including during "higher intensity" fitness activities. As would later become clear, Fitbit's heart-rate tracking devices were frequently inaccurate and were particularly inaccurate during high-intensity activities.

88.     The IPO Prospectus Summary states:

We dedicate significant resources to developing proprietary sensors, algorithms, and software to ensure that our products have highly accurate measurements, insightful analytics, compact sizes, durability, and long battery lives.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

89.     Under the headings "Our Competitive Strengths—What Sets Us Apart" and "Advanced, purpose-built hardware and software technologies" the IPO Prospectus states:

Our connected health and fitness devices leverage industry-standard technologies, such as Bluetooth low energy, as well as proprietary technologies, such as our PurePulse continuous heart rate tracking, and our algorithms that more accurately measure and analyze user health and fitness metrics.

90.     Under the headings "Our Solution—The Fitbit Platform" and "Tracking activities through our connected health and fitness devices" the IPO Prospectus states:

Our devices, which include wrist-based and clippable fitness trackers and our Wi-Fi connected scale, feature proprietary and advanced sensor technologies and algorithms as well as high accuracy and long battery life.

91.     Under the heading "What Our Connected Health and Fitness Devices Track" and the subheading "Heart rate," the IPO Prospectus states:

On trackers that are outfitted with our proprietary PurePulse technology, our users are able to automatically and continuously track their heart rate during everyday activity and exercise. Our PurePulse technology uses wrist-based optical LEDs, which measures heart rate using light reflection. We believe our PurePulse technology makes heart rate relevant as a means to more accurately measure calorie burn, maintain intensity during exercise, and train more effectively by using heart rate zones. Additionally, our heart rate tracking technology can conveniently provide our users with their resting heart rate, which is a widely used indicator of cardiovascular fitness and conditioning.

92.     These statements were materially false and misleading because Fitbit's heart-rate tracking devices were frequently inaccurate and were particularly inaccurate during exercise.

93.     Further, Judge Illston held in the Securities Order that these statements were false and misleading.  Specifically, the Securities Order stated:  "Likewise here, plaintiffs have alleged that Fitbit claims that its devices could 'automatically and continuously track their heart rate during everyday activity and exercise' when in fact the devices could not."

94.     The IPO Prospectus further described the Charge HR and Surge as suitable for use during vigorous exercise and other high-intensity activity, falsely implying that the Charge HR and Surge delivered accurate heart-rate readings during such activities.

95.     The IPO Prospectus describes Fitbit Charge HR as "a wireless heart rate and activity wristband for Active users."  It describes "active users" as "often interested in monitoring exercise

intensity through heart rate tracking in addition to activity tracking."

96.     Likewise, the IPO Prospectus describes Fitbit Surge as a "fitness 'super watch' for Performance users" and states that it "can track heart rate during a variety of distinct cardiovascular workouts and other exercises."  It describes "performance users" as people who "train regularly to improve their performance and achieve their personal bests," "participate in endurance sports and fitness activities with higher intensity and longer duration, such as interval or distance running and cycling, and thrive on personal improvement and competition."

97.     These statements were materially false and misleading because Fitbit's heart-rate tracking devices were frequently inaccurate and were particularly inaccurate during high-intensity activities, including "endurance sports and fitness activities with higher intensity and longer duration, such as interval or distance running and cycling.

98.     The fact that the IPO Prospectus was false and misleading also rendered the IPO Registration Statement false and misleading.

99.     In connection with the IPO, Fitbit's directors and officers, and the holders of substantially all of Fitbit's common stock prior to the IPO, entered into lock-up agreements (the "Lock-Up Agreements").  The Lock-Up Agreements prevented these insiders and investors from selling their stock for 180 days, or until December 14, 2015.  The IPO Prospectus filed June 18, 2015 states:

> All of our directors, executive officers, and the holders of substantially all of our outstanding equity securities are subject to lock-up agreements with the underwriters or market standoff provisions in agreements with us that, subject to certain exceptions, prohibit them from offering for sale, selling, contracting to sell, granting any option for the sale of, transferring, or otherwise disposing of any shares of our common stock, options, or warrants to acquire shares of our common stock, or any security or instrument related to this common stock, option, or warrant for a period of at least 180 days following the date of this prospectus, without the prior written consent of Morgan Stanley & Co. LLC or us, as the case may be.
>
> *     *     *
>
> We, all of our directors and officers, and the holders of substantially all of our outstanding equity securities have agreed that, without the prior written consent of Morgan Stanley & Co. LLC on behalf of the underwriters, we and they will not, for

- 24 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

180 days after the date of this prospectus:

- offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right, or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any shares of Class A common stock, Class B common stock, or any securities convertible into or exercisable or exchangeable for shares of Class A common stock or Class B common stock;

- enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of Class A common stock or Class B common stock, whether any such transaction described in these first two bullet points is to be settled by delivery of Class A common stock, Class B common stock, or such other securities, in cash or otherwise;

- in the case of our directors, officers, and security holders, make any demand for or exercise any right with respect to, the registration of any shares of Class A common stock, Class B common stock, or any securities convertible into or exercisable or exchangeable for Class A common stock or Class B common stock;

- in our case, file any registration statement with the SEC relating to the offering of any shares of Class A common stock, Class B common stock, or any securities convertible into or exercisable or exchangeable for Class A common stock or Class B common stock, except for the filing of registration statements on Form S-8 with respect to the employee benefit plans described in this prospectus; or

- in our case, make any public announcement of any intention to do any of the foregoing.

100. A June 25, 2015 article in *The Washington Post* entitled "Fitbit's CEO discusses the looming Apple Watch, and how having friends with Fitbits makes you healthier" contains the following exchange between an interviewer and defendant Park:

[Q]: Will anyone in wrist-wearables get optical heart rate sensors right?

[Park]: That's implying that they're all wrong today, which I disagree with. With any technology there's always a tradeoff. In some cases, there's accuracy in certain situations.

[Q]: Are you pleased with the optical HR tracking on the Surge?

[Park]: I wear it 24/7 so I'm happy with it.

[Q]: But not everyone is.

[Park]: Look, there are tradeoffs ... With research and advancements in technology, there are always going to be major advancements in accuracy, battery life and form factor.

- 25 -

101.    According to the Company's "Risk Factors" section of Fitbit's Quarterly Report on Form 10-Q for the second quarter of fiscal 2015 filed with the SEC on August 7, 2015, "[s]ales of substantial amounts of our Class A common stock in the public markets, or the perception that they might occur, could cause the market price of our Class A common stock to decline."  The August 7, 2015 Form 10-Q states:

> Sales of substantial amounts of our Class A common stock in the public markets, or the perception that they might occur, could cause the market price of our Class A common stock to decline. Sales of a substantial number of shares of our Class A common stock into the public market, particularly sales by our directors, executive officers, and principal stockholders, or the perception that these sales might occur, could cause the market price of our Class A common stock to decline. The 42,061,250 shares of our Class A common stock sold in our initial public offering are freely tradable in the public market. The remaining shares of our Class A common stock and Class B common stock are currently restricted from resale as a result of lock-up and market standoff agreements. These securities will become available to be sold on December 15, 2015. Morgan Stanley & Co. LLC, as a representative of the underwriters of our IPO, may, in its discretion, permit our security holders to sell shares prior to the expiration of the restrictive provisions contained in the lock-up agreements.

102.    In a conference call with Fitbit investors and stock market analysts on August 5, 2015, defendant Park stated "the PurePulse technology in Charge HR and Surge took many, many years to develop and perfect.  The key thing for us is we will only launch products when we feel that they're ready."

103.    This statement falsely implied that PurePulse technology was "ready" for the purposes for which Fitbit advertised the Charge HR and Surge, including vigorous exercise.  In fact, Fitbit's heart-rate tracking devices were frequently inaccurate and were particularly inaccurate during such high-intensity activities.

104.    On October 31, 2015, the Board caused the Lock-Up Agreements to be terminated one and a half months early (*i.e.*, waived).  Critically, upon information and belief, this waiver of the Lock-Up Agreements occurred under Defendants' direction and on their watch, and was initiated by the Board.  This is readily apparent from a Fitbit Form 8-K filed on November 2, 2015, which sets forth, in relevant part:

- 26 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST
ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

Lock-Up Release

Fitbit also announces today that Morgan Stanley & Co. LLC, on behalf of the underwriters of Fitbit's initial public offering in June 2015, ***at the request of Fitbit***, has agreed to release the lock-up restrictions for Fitbit's employees and consultants as of October 31, 2015 with respect to approximately 2.3 million shares, which represents up to 10% of the shares of Fitbit common stock, options, and restricted stock units held by such employees and consultants. The release will be effective on November 4, 2015. This will allow Fitbit's employees and consultants an opportunity in 2015 for liquidity prior to commencement of Fitbit's quarter end blackout period, which would prohibit any sales until that period ends after the earnings release for the fourth quarter of 2015. The lock-up restrictions are scheduled to expire with respect to the remaining shares as originally planned on December 14, 2015. [Emphasis added.]

105.   The Secondary Offering Prospectus, filed on November 13, 2015 as part of the Secondary Offering Registration Statement, was materially false and misleading because it contained assertions by Defendants that Fitbit's heart-rate tracking devices had "highly accurate measurements" at all times, including during "higher intensity" fitness activities.  As would later become clear, Fitbit's heart-rate tracking devices were frequently inaccurate and were particularly inaccurate during high intensity activities.

106.   The Secondary Offering Prospectus repeated verbatim each of the IPO Prospectus's above false and misleading statements about the accuracy of Fitbit's heart-rate monitoring, and about the ability of Fitbit devices to track heart rates during high intensity activities.

107.   These statements (issued under Defendants' direction and on their watch) were materially false and misleading because Fitbit's heart-rate tracking devices were frequently inaccurate and were particularly inaccurate during high intensity activities.

108.   Before its filing, Defendants (and particularly the Insider Selling Defendants) read and authorized the Secondary Offering Registration Statement, which was signed by Defendants.  Given that these defendants not only approved and authorized the Secondary Offering, but also (as discussed below) expressly stood to profit from it by being allowed to sell their Fitbit shares (through the waiver of their prior Lock-Up Agreements) and received a personal benefit not equally shared by all shareholders, the decision to authorize the Secondary Offering in the first place is subject to entire fairness scrutiny.  As expected, given Defendants' interest in ensuring a favorably high offering price, the Secondary Offering Documents presented a highly positive picture of the Company's business, performance, prospects, and products, while omitting crucial realities, making the documents

1   materially misleading.

2        109.   In a press release dated November 23, 2015, Defendants describe "enhancements to

3   Pure-Pulse™ heart rate tracking to Fitbit Charge HR™ and Fitbit Surge™" as follows:

4       Enhanced Real-Time Heart Rate Tracking During Workouts

5       Fitbit's proprietary PurePulse heart rate technology has been updated to provide users
    with an even better heart rate tracking experience during and after high intensity
6       workouts like boot camp and Zumba. The update is activated when using Exercise
    Mode on Fitbit Charge HR and multi-sport modes on Fitbit Surge. PurePulse optical
7       technology provides users with continuous, automatic wrist based heart rate tracking
    including resting heart rate and heart rate trends over time - without the need for an
8       uncomfortable chest strap.

9       Fitbit is dedicated to developing the most consistently accurate wrist-based activity
    trackers on the market. This software update improves upon an already positive heart
10      rate tracking offering.

11      110.   These statements were materially false and misleading because Fitbit's heart-rate

12  tracking devices were frequently inaccurate and were particularly inaccurate during "high-intensity

13  workouts like boot camp and Zumba."   Defendants failed to disclose information known to them

14  about the inaccuracy of Fitbit devices' heart-rate tracking.

15      111.   The fact that the Secondary Offering Prospectus was false and misleading also

16  rendered the Secondary Offering Registration Statement (signed by Defendants) false and misleading.

17      112.   On February 29, 2016, Defendants caused the Company to file with the SEC an annual

18  report on Form 10-K (the "2015 10-K"), which was signed by Defendants.  Among other things, the

19  2015 10-K repeated the false and misleading statements from the IPO Prospectus and Secondary

20  Offering Prospectus, as set forth above.  In addition, the 2015 10-K contained certifications pursuant

21  to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") by defendants Park and Zerella, who

22  stated:

23      I, [James Park/ William Zerella], certify that:

24      1. I have reviewed this annual report on Form 10-K of Fitbit, Inc.;

25      2. Based on my knowledge, this report does not contain any untrue statement of a
    material fact or omit to state a material fact necessary to make the statements made, in
26      light of the circumstances under which such statements were made, not misleading
    with respect to the period covered by this report;
27

28
- 28 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST
ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*       *       *

I, [James Park, President, Chief Executive Officer and Chairman of Fitbit Inc./William Zerella, Chief Financial Officer of Fitbit Inc.], do hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge:

• the Annual Report on Form 10-K of Fitbit, Inc. for the year ended December 31, 2015 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

• the information contained in such Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Fitbit, Inc.

- 29 -

113.   The 2015 10-K failed to disclose the degree to which the Company's products provided inaccurate readings.   Among other things, the 2015 10-K failed to disclose that the Company's devices incorrectly measured heart rate by an average of 20 beats per minute during moderate to high exercise and in fact did not accurately measure a user's heart rate, particularly during moderate to high intensity exercise, and could be used to provide a meaningful estimate of a user's heart rate.  This was a component of the Company's core operations, and the omission of this material information rendered the 2015 10-K false and misleading.

114.   For many of these same reasons, the Company's Forms 10-Q filed with the SEC on August 7, 2015 and November 2, 2015 (and issued under Defendants' direction and on their watch) were false and misleading.   These Forms 10-Q contained SOX Certifications, which were substantially similar to those set forth above.

115.   Finally, on April 13, 2016, Defendants filed with the SEC and disseminated to shareholders a Proxy Statement on Form DEF 14A (the "2016 Proxy").  The 2016 Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for election. However, in the 2016 Proxy, Defendants misrepresented and/or failed to disclose that the Company's devices incorrectly measured heart rate by an average of 20 beats per minute during moderate to high exercise and, in fact, did not accurately measure a user's heart rate, particularly during moderate to high intensity exercise, and could be used to provide a meaningful estimate of a user's heart rate.  This was a component of the Company's core operations, and the omission of this material information rendered the 2016 Proxy false and misleading.

116.   Accordingly, as a result of Defendants' actions and false and misleading statements detailed herein, the Company has suffered damages.  These damages include (but are not limited to) severe loss of reputation and standing, harm to goodwill, being named as a defendant in the Fitbit Consumer Class Action, decimation of the Company's stock price, and the harm suffered as a result of the Insider Selling Defendants' illicit sales of the Company's shares (as detailed below).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

**H.** **The Securities Action is Sustained**

117. As discussed above, as a result of Defendants' actions set forth above, beginning in January 2016, Fitbit became the subject of the Securities Action. The Class Period in the Securities Action (which was expanded by the Securities Complaint) is defined as June 18, 2015 through May 19, 2016. Importantly, the Defendants named herein are all likewise named defendants in the Securities Action.

118. On October 26, 2016, Judge Illston of the Securities Court denied the Securities Motion. Judge Illston's Securities Order held, *inter alia*, that the plaintiffs to the Securities Action had sufficiently pled that defendants were engaged in a scheme to defraud Fitbit and Fitbit's shareholders. In particular, in the Securities Order, Judge Illston held, *inter alia*:

- "[P]laintiffs have pointed to numerous statements in which Fitbit claimed that its devices were able to track heart rates and could do so with a high degree of accuracy. Relying on multiple and varying sources, plaintiffs allege that the devices could not do this. Whether the statements were in fact false is not appropriate for resolution on a motion to dismiss. At this stage, plaintiffs have sufficiently alleged a material misrepresentation or omission by the defendant."

- "Taken together, the allegations in this case are at least as cogent or compelling as a plausible alternative inference, namely that Fitbit executives were simply unaware of the high degree of inaccuracy in PurePulse devices alleged. Particularly given the contributions these devices made to Fitbit's revenue stream in 2015, and the allegations by CW 1 and CW 2, the Court finds that a holistic review of the allegations suffices to establish scienter."

- "The Amended Complaint alleges, 'Over the course of January 5, 2016 to May 19, 2016, the truth about the inaccuracy of Fitbit's heart-rate tracking devices was revealed in a lawsuit, subsequent reporting, and finally a comprehensive study of Fitbit devices' heart-rate tracking accuracy' and that as a result, 'Fitbit's stock price fell from a high of $30.96 on January 5 to close at $13.99 on May 19,' an overall loss of 54.8 percent in

value.  Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage.

- "The allegedly false and misleading IPO statements for the Section 11 claim are included among those alleged in plaintiffs' Section 10(b) claims.  Nor do any risk disclosures in the Registration Statement negate this finding, as the Underwriter defendants argue. See Underwriter Mot. at 4; Dkt. No. 108, Keats Decl. Ex. A.5 Defendants cite to a portion of the Prospectus that states:

> Furthermore, our products are used to track and display various information about users' activities, such as daily steps taken, calories burned, distance traveled, floors climbed, active minutes, sleep duration and quality, and heart rate and GPS-based information such as speed, distance, and exercise routes. *In the past*, there have been reports and claims made against us alleging that our products do not provide accurate measurements and data to users, including claims asserting that certain features of our products do not operate as advertised. Such reports and claims have resulted in negative publicity, and, in some cases, have required us to expend time and resources to defend litigation. *If* our products fail to provide accurate measurements and data to users, or if there are reports or claims of inaccurate measurements or claims regarding the overall health benefits of our products and services in the future, we may become the subject of negative publicity, litigation, including class action litigation, regulatory proceedings, and warranty claims, and our brand, operating results, and business could be harmed.
> Keats Decl. Ex. A at 20 (emphases added); Fitbit Mot. at 4;
> Underwriter Mot. at 4.

This statement does not suffice to "render it implausible that any reasonable investor would have been misled" regarding the accuracy of Fitbit's heart rate tracking devices. See Underwriter Mot. at 4. The statement does not disclose that there were presently, at the time of the IPO, indications that Fitbit's heart rate monitoring technology was inaccurate, as the Amended Complaint alleges. It states only that "in the past" such claims generally had been made regarding "certain features of our products" and that "if" in the future the "products fail to provide accurate measurements" then Fitbit's business "could be harmed."

- "The Court therefore finds that, as with the Section 10(b) allegations, the Amended Complaint sufficiently states actionable misrepresentations under Section 11 at this

- 32 -

1    time."

2       119.   Critically, as alleged below, because a majority of the Board (defendants Park,

3    Friedman, Callaghan, Murray and Paisley) are each named defendants in the Securities Action and

4    have had claims for violations of the federal securities laws sustained against them.  Given their

5    potential direct culpability and/or exposure in that action, it is impossible for defendants Park,

6    Friedman, Callaghan, Murray and Paisley, who comprise a majority of the Board, to consider a

7    demand impartially regarding this action, which is based on the same set of factually allegations.

8    Accordingly, as alleged below, a pre-suit demand upon defendants Park, Friedman, Callaghan,

9    Murray, and Paisley (and, thus, the entire Board) is independently excused on this basis alone.

10      **I.**     **The Insider Selling Defendants' Illicit Sales**

11      120.   During the Relevant Period, and while in possession of material, adverse, non-public

12   information, the Insider Selling Defendants (individually and/or through entities with which they

13   controlled or were affiliated with), who comprise a majority of the Board, sold their shares of Fitbit

14   stock at artificially inflated prices, reaping proceeds of over $386 million.

15      121.   On June 23, 2015, as part of the IPO and while in possession of material, adverse, non-

16   public information, defendant Park sold 1,095,820 shares of Fitbit stock at $18.80 per share, for

17   proceeds of $20,601,400.  Then, on November 18, 2015, as part of the Secondary Offering and while

18   in possession of material, adverse, non-public information, defendant Park sold 2,226,980 shares of

19   Fitbit stock at $28.13 per share, for proceeds of $62,644,900.  Upon information and belief, these are

20   the only two instances when defendant Park has ever sold Fitbit shares, rendering the sales highly

21   unusual and suspicious.  Upon information and belief, defendant Park was only able to participate in

22   the Secondary Offering (and sell shares on November 18, 2015) because the provision of his prior

23   Lock-Up Agreement was waived.

24      122.   On November 18, 2015, as part of the Secondary Offering and while in possession of

25   material, adverse, non-public information, defendant Zerella sold 216,000 shares of Fitbit stock at

26   $28.13 per share, for proceeds of $6,076,080.  Upon information and belief, this is the only instance

27   when defendant Zerella has ever sold Fitbit shares, rendering the sale highly unusual and suspicious.

28
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST
ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

1   Upon information and belief, defendant Zerella was only able to participate in the Secondary Offering

2   (and sell shares on November 18, 2015) because the provision of his prior Lock-Up Agreement was

3   waived.

4          123.   On June 23, 2015, as part of the IPO and while in possession of material, adverse, non-

5   public information, defendant Callaghan sold 3,133,710 shares of Fitbit stock at $18.80 per share, for

6   proceeds of $58,913,700.  Then, on November 18, 2015, as part of the Secondary Offering and while

7   in possession of material, adverse, non-public information, defendant Callaghan sold 3,782,380

8   shares of Fitbit stock at $28.13 per share, for proceeds of $106,398,000.  Finally, on December 9,

9   2015, while in possession of material, adverse, non-public information, defendant Callaghan sold

10   1,077,960 shares of Fitbit stock at $28.13 per share, for proceeds of $30,322,900.  Defendant

11   Callaghan would not sell any additional shares until August 4, 2016, rendering these sales highly

12   unusual and suspicious.  Upon information and belief, defendant Callaghan was only able to

13   participate in the Secondary Offering (and sell shares on November 18, 2015) because the provision

14   of his prior Lock-Up Agreement was waived.

15          124.   On June 23, 2015, as part of the IPO and while in possession of material, adverse, non-

16   public information, defendant Murray sold 825,000 shares of Fitbit stock at $18.80 per share, for

17   proceeds of 15,510,000.  Then, on November 18, 2015, as part of the Secondary Offering and while

18   in possession of material, adverse, non-public information, defendant Murray sold 936,641 shares of

19   his Fitbit stock at $28.13 per share, for proceeds of 26,347,700.  Finally, on December 9, 2015, while

20   in possession of material, adverse, non-public information, defendant Murray sold 266,938 shares of

21   his Fitbit stock at $28.13 per share, for proceeds of $7,508,970.  Defendant Murray would not sell

22   any additional shares until May 31, 2016, rendering these sales highly unusual and suspicious.  Upon

23   information and belief, defendant Murray was only able to participate in the Secondary Offering (and

24   sell shares on November 18, 2015) because the provision of his prior Lock-Up Agreement was

25   waived.

26          125.   On June 23, 2015, as part of the IPO and while in possession of material, adverse, non-

27   public information, defendant Friedman sold 1,095,820 shares of Fitbit stock at $18.80 per share, for

28

proceeds of $20,601,400.  Then, on November 18, 2015, as part of the Secondary Offering and while in possession of material, adverse, non-public information, defendant Friedman sold 1,113,490 shares of Fitbit stock at $28.13 per share, for proceeds of $31,322,500.  Upon information and belief, these are the only two instances when defendant Friedman has ever sold Fitbit shares, rendering the sales highly unusual and suspicious.  Upon information and belief, defendant Friedman was only able to participate in the Secondary Offering (and sell shares on November 18, 2015) because the provision of his prior Lock-Up Agreement was waived.

126.    The sales by the Insider Selling Defendants are set forth in the following chart:

| Date | Defendant | Shares | Price | Proceeds |
|---|---|---|---|---|
| 6/23/15 | Callaghan | 3,133,710 | $18.80 | $58,913,700 |
| 6/23/15 | Murray | 825,000 | $18.80 | $15,510,000 |
| 6/23/15 | Friedman | 1,095,820 | $18.80 | $20,601,400 |
| 6/23/15 | Park | 1,095,820 | $18.80 | $20,601,400 |
| 11/18/15 | Friedman | 1,113,490 | $28.13 | $31,322,500 |
| 11/18/15 | Murray | 936,641 | $28.13 | $26,347,700 |
| 11/18/15 | Park | 2,226,980 | $28.13 | $62,644,900 |
| 11/18/15 | Zerella | 216,000 | $28.13 | $6,076,080 |
| 11/18/15 | Callaghan | 3,782,380 | $28.13 | $106,398,000 |
| 12/9/15 | Murray | 266,938 | $28.13 | $7,508,970 |
| 12/9/15 | Callaghan | 1,077,960 | $28.13 | $30,322,900 |
| **TOTAL** | | | | **$386,247,550** |

127.    Critically, defendants Park, Friedman, Callaghan and Murray, who constitute a majority of the Board, sold shares of Fitbit stock while in possession of material, adverse, non-public information, during a time in which Fitbit stock was artificially inflated due to Defendants' false and misleading statements.  Further, defendants Park, Friedman, Callaghan and Murray (a majority of the Board) were only able to participate in the Secondary Offering (and sell shares on November 18,

2015) because the provision of their prior Lock-Up Agreements were waived.

128.    As a result of these illicit sales, these defendants received direct financial benefits not shared with Fitbit shareholders, and are, therefore, directly interested in a demand.  Further, because defendants Park, Friedman, Callaghan and Murray constitute a majority of the Board, any demand on the Board is independently excused on this basis alone.

**J.    Confidential Witness Accounts in the Securities Complaint Confirms Defendants' Knowledge**

129.    The Securities Complaint contained the testimony of confidential witnesses ("CWs") who allegedly reported that Fitbit employees and management were well aware of the inaccuracy of the Company's heart-rate monitoring technology.

130.    It has been alleged that Confidential Witness 1 ("CW1") was a data scientist at Fitbit from November 2014 to December 2015.  It has been alleged that CW1 was a paid contractor and consultant, hired specifically to develop quality-assurance analytics for Fitbit's Charge HR, Surge, and other wearable devices.

131.    It has been alleged that according to CW1, Fitbit had two large sources of data concerning the efficacy of its products: (1) biometric data from Fitbit's online user accounts; and (2) customer complaints.  It has been alleged that as of November 2014, Fitbit had no methods for analyzing these data sources, either for purposes of quality assurance or product development.  It has been alleged that instead of learning from its device failures, Fitbit's practice was simply to send a replacement or upgraded Fitbit device to anyone who complained for any reason.

132.    It has been alleged that by the summer of 2015, CW1 began presenting Fitbit Chief Operations Officer Hansgregory "Hans" C. Hartmann with monthly reports that documented and ranked various types of customer complaints and device failures.

133.    It has been alleged that according to CW1, by June or July 2015, his monthly reports noted significant issues with the accuracy of Fitbit's heart-rate monitoring, relative to other types of failures.

134.    For example, it has been alleged that sweat, dirt, or other impurities often interfered

with the optical sensor, resulting in highly inaccurate readings.  It has been alleged that there was also a consistent problem with female users with thin wrists, because the wristband would not fit properly and would thus move around constantly, interfering with the wristband's ability to detect changes in blood volume over time and resulting in highly inaccurate readings.

135.     It has been alleged that at some point around August or September 2015, CW1 made a PowerPoint presentation to Fitbit Senior Director of Product Engineering Tina Dao and Fitbit VP of Product Engineering Sam Bowen about these problems, including with respect to inaccurate heart-rate monitoring.  It has been alleged that although Hartmann did not attend that presentation, Dao reported to Hartmann.

136.     It has been alleged that although CW1 presented several recommendations in that PowerPoint, these recommendations were ignored.

137.     Moreover, it has been alleged that according to CW1, Fitbit never commissioned scientific or medical studies, or any kind of third-party testing, to assess its products' tracking and monitoring features or to validate their accuracy or consistency.  Instead, it has been alleged that CW1 said that Fitbit's quality-assurance program consisted largely of a group of athletes who exercised while wearing Fitbit devices and then recorded the results.

138.     It has been alleged that according to CW1, Fitbit's office had an area specifically for these athletes' testing (the "Testing Area"), with fitness equipment and computer workstations for recording the athletes' data.

139.     It has been alleged that according to CW1, in June and July 2015, the Fitbit employees who worked with the athletes' data were focused entirely on testing and understanding the inaccuracies in Fitbit's heart-rate monitoring, rather than on other issues.

140.     It has been alleged that according to CW1, defendant Park frequently visited the Testing Area.

141.     It has been alleged that Confidential Witness 2 ("CW2") was a contract fitness tester at Fitbit from February 2015 to April 2015 and then a Fitness Tester Manager from April 2015 until July 2015.  It has been alleged that CW2 worked as an independent contractor.

142.    It has been alleged that CW2 confirmed that Fitbit hired him primarily to test the accuracy of Fitbit's heart-rate monitoring devices and that Fitbit management was concerned with their accuracy.

143.    It has been alleged that as Fitness Tester Manager, CW2 managed a team of 8 to 10 fitness testers, supervising them as they performed various exercises while wearing Fitbit devices and then managing the logging of their heart-rate results.  It has been alleged that CW2 ultimately reported to Fitbit Chief Operating Officer Hartmann.

144.    It has been alleged that upon information and belief, CW2 managed the same team of athletes referenced by CW1.

145.    It has been alleged that CW2 found Fitbit's heart-rate monitoring devices to be highly inaccurate, particularly during vigorous exercise.  For example, if a user's wrist was sweaty, the heart-rate results reported by Fitbit's devices were useless.  It has been alleged that CW2 also reported that the results were often inaccurate for users with either very light or very dark skin tones.

146.    It has been alleged that Confidential Witness 3 ("CW3") was an executive assistant at Fitbit from January 2015 until July 2015.  It has been alleged that according to CW3, because the Testing Area was adjacent to a dining area, Fitbit employees were widely familiar with the Testing Area as well as with the underlying problems with the accuracy of Fitbit's heart-rate monitoring.

147.    It has been alleged that according to CW3, defendant Zerella was well aware of the Testing Area and even considered providing it with additional office space.

148.    It has been alleged that Fitbit Chief Operations Officer Hartmann reported directly to Fitbit CEO, defendant Park.

149.    It has been alleged that according to CW3, Hartmann attended weekly executive staff meetings with defendants Park and Zerella, where much of the Company's business and decision-making was done.

150.    It has been alleged that CW1 reported directly to Hartmann, and CW2 indirectly reported to Hartmann. CW1 and CW2 both provided Hartman with information about the inaccuracy of Fitbit's heart-rate monitoring devices.

- 38 -

151.   It has been alleged that CW1 believes Hartmann provided CW1's findings and recommendations to members of the Company's executive team, including Park.

152.   It has been alleged that upon information and belief, defendants Park, Zerella, and Friedman were aware of CW1's findings and recommendations when making public statements to shareholders.

## DERIVATIVE AND DEMAND ALLEGATIONS

153.   Plaintiff brings this action derivatively in the right and for the benefit Fitbit to redress the breaches of fiduciary duty and other violations of law by Defendants.

154.   Plaintiff will adequately and fairly represent the interests of Fitbit and its shareholders in enforcing and prosecuting its rights.

155.   The Board currently consists of the following seven (7) directors: defendants Park, Friedman, Callaghan, Murray and Paisley, and non-defendants Laura Alber ("Alber") and Glenda Flanagan ("Flanagan").  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the reasons that follow.

### A.   Demand is Excused Because a Majority of the Board Have Had Claims <u>Sustained Against them in the Related Securities Action</u>

156.   Defendants Park, Friedman, Callaghan, Murray and Paisley (a majority of the Board) are each named defendants in the Securities Action, which is based on substantially similar factual allegations as those raised in this shareholder derivative action, which renders them directly interested in a demand.  As alleged herein, the operative complaint in the Securities Action has survived a motion to dismiss, and that action is proceeding to trial.  In light of the Securities Action, and their potential direct culpability and/or exposure in that action, it is impossible for defendants Park, Friedman, Callaghan, Murray and Paisley, who comprise a majority of the Board, to consider a demand impartially.  Accordingly, a pre-suit demand upon defendants Park, Friedman, Callaghan, Murray, and Paisley (and, thus, the entire Board) is excused as futile.

### B.   Demand is Excused Because a Majority of the Board Engaged in Illicit Insider <u>Trading</u>

157.   Defendants Park, Friedman, Murray and Callaghan – a majority of the Board – are

- 39 -

interested and face a substantial likelihood of personal liability in connection with their illicit insider stock sales and the decision to approve and authorize the Secondary Offering discussed above. These defendants were only able to participate in the Secondary Offering and execute the illicit insider stock sales because the provisions of their prior Lock-Up Agreements entered into pursuant to the IPO were waived. Accordingly, these defendants each received improper personal benefits that were not shared with all other Fitbit shareholders. Thus, these defendants were interested and breached their fiduciary duty of loyalty, which independently excuses a demand. Further, because these defendants not only approved and authorized the Secondary Offering, but likewise stood to profit from it through the waiver of their Lock-Up Agreements (a benefit not shared equally with all other Fitbit shareholders), the decision to authorize the Secondary Offering in the first place is subjected to entire fairness scrutiny.

158.    The Board waived in a discriminatory manner certain contractual restrictions that had prevented many pre-IPO investors from selling their stock for a designated period. Selectively waiving these "lock-up" restrictions permitted some pre-IPO shareholders to sell a portion of their holdings one month before other pre-IPO shareholders.   In particular, with the consent of Morgan Stanley, Fitbit's Board restructured the lock-up restrictions.  In October 2015, Fitbit's directors decided to modify the lock-up restrictions to permit certain pre-IPO shareholders to sell some of their shares before the original December 14, 2015 expiration date.  These 2.3 million shares of common stock were released from the Lock-Up Agreements on November 4, 2015.  Upon information and belief, four of Fitbit's directors, a majority of the Board, received this opportunity, and demand is excused on this basis alone.

159.    During the Relevant Period, defendant Park illicitly sold shares of Fitbit stock for proceeds of approximately $83.246 million while in possession of material, adverse, non-public information, during a time in which Fitbit stock was artificially inflated due to Defendants' false and misleading statements.  Upon information and belief, defendant Park was only able to participate in the Secondary Offering because the provision of his prior Lock-Up Agreement was waived.  As a result of these illicit sales, defendant Park received direct financial benefits not shared with Fitbit

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

shareholders, and is, therefore, directly interested in a demand.  Additionally, as a result of these illicit sales, defendant Park violated the Codes.  Further, defendant Park is interested in a demand because he faces a substantial likelihood of liability for his breaches of fiduciary duties of loyalty and good faith arising from his illicit insider sales.

160.    During the Relevant Period, defendant Friedman illicitly sold shares of Fitbit stock for proceeds of approximately $51.923 million while in possession of material, adverse, non-public information, during a time in which Fitbit stock was artificially inflated due to Defendants' false and misleading statements.  Upon information and belief, defendant Friedman was only able to participate in the Secondary Offering because the provision of his prior Lock-Up Agreement was waived.    As a result of these illicit sales, defendant Friedman received direct financial benefits not shared with Fitbit shareholders, and is, therefore, directly interested in a demand.  Additionally, as a result of these illicit sales, defendant Friedman violated the Company's Codes.  Further, defendant Friedman is interested in a demand because he faces a substantial likelihood of liability for his breaches of fiduciary duties of loyalty and good faith arising from his illicit insider sales.

161.    During the Relevant Period, defendant Callaghan illicitly sold shares of Fitbit stock for proceeds of approximately $195.634 million while in possession of material, adverse, non-public information, during a time in which Fitbit stock was artificially inflated due to Defendants' false and misleading statements.  Upon information and belief, defendant Friedman was only able to participate in the Secondary Offering because the provision of his prior Lock-Up Agreement was waived.  As a result of these illicit sales, defendant Callaghan received direct financial benefits not shared with Fitbit shareholders, and is, therefore, directly interested in a demand.  Additionally, as a result of these illicit sales, defendant Callaghan violated the Company's Director Code of Ethics.  Further, defendant Callaghan is interested in a demand because he faces a substantial likelihood of liability for his breaches of fiduciary duties of loyalty and good faith arising from his illicit insider sales.

162.    During the Relevant Period, defendant Murray illicitly sold shares of Fitbit stock for proceeds of approximately $49.366 million while in possession of material, adverse, non-public information, during a time in which Fitbit stock was artificially inflated due to Defendants' false and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST
ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

misleading statements.  Upon information and belief, defendant Murray was only able to participate in the Secondary Offering because the provision of his prior Lock-Up Agreement was waived.  As a result of these illicit sales, defendant Murray received direct financial benefits not shared with Fitbit shareholders, and is, therefore, directly interested in a demand.  Additionally, as a result of these illicit sales, defendant Murray violated the Company's Director Code of Ethics.  Further, defendant Murray is interested in a demand because he faces a substantial likelihood of liability for his breaches of fiduciary duties of loyalty and good faith arising from his illicit insider sales.

163.    Collectively, because defendants Park, Friedman, Callaghan and Murray constitute a majority of the Board, demand is excused on this basis alone.

**C.    Other Reasons Demand is Excused**

164.    The principal professional occupation of defendant Park is his employment with Fitbit as its CEO, pursuant to which he receives substantial monetary compensation and other benefits.  In addition, according to the 2016 Proxy, Defendants have admitted that defendant Park is not independent.  Thus, defendant Park lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.  In addition, defendant Park faces a substantial likelihood of liability for his illicit insider sales, as set forth herein.

165.    The principal professional occupation of defendant Friedman is his employment with Fitbit as its Chief Technology Officer and Executive Officer, pursuant to which he receives substantial monetary compensation and other benefits.  In addition, according to the 2016 Proxy, Defendants have admitted that defendant Friedman is not independent.  Thus, defendant Friedman lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.  In addition, defendant Friedman faces a substantial likelihood of liability for his illicit insider sales, as set forth herein.

166.    There is reason to doubt that defendant Murray is independent.  Specifically, in 2015, in connection with a distribution agreement Fitbit entered into with SoftBank BB Corporation, or SoftBank BB, an entity affiliated with SoftBank PrinceVille Investments, L.P. that holds more than

5% of Fitbit's outstanding capital stock, Defendants caused the Company to repay SoftBank BB $3.1 million for sales returns accepted in 2014, and SoftBank BB paid Fitbit $0.5 million, due to an amendment of the distribution agreement. Defendant Murray is a Managing Member of SB PV GP LLC, an entity affiliated with SoftBank PrinceVille Investments, L.P.  Due to this intertwined professional relationship, defendant Murray would be unable to impartially consider a demand to commence and vigorously prosecute this action.  In addition, defendant Murray faces a substantial likelihood of liability for his illicit insider sales, as set forth herein.

167.    Defendants Park, Friedman, Callaghan, Murray and Paisley (a majority of the Board) served as directors of the Company during all of the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.   The statements and actions regarding the Company's operations (particularly those regarding the accuracy of the Company's products) that defendants Park, Friedman, Callaghan, Murray and Paisley caused or allowed to be made repeatedly during the Relevant Period were an integral aspect of the Company's core operations.  It was these very actions and statements made and/or caused or allowed to be made by defendants Park, Friedman, Callaghan, Murray and Paisley that caused the Company to suffer severe reputational harm and decimation in stock price, as set forth herein.  This was in violation of (among other things) these Defendants' fiduciary duties of good faith and loyalty, as well as the Codes.  Thus, defendants Park, Friedman, Callaghan, Murray and Paisley (again, a majority of the Board) each faces a substantial likelihood of liability for their acts in connection with these actions and statements, rendering a demand upon them futile.

168.    During the Relevant Period, defendants Murray and Paisley served as members of the Audit Committee.  Pursuant to the Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports, reviewing the integrity of the Company's internal controls, ensuring the integrity of the Company's financial statements filed with the SEC, and ensuring that the Company was in compliance with legal and regulatory requirements.  Defendants Murray and Paisley breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed

1    or permitted the Company to disseminate false and misleading statements in the Company's SEC

2    filings and other disclosures, caused the above-discussed internal control failures, and caused or

3    allowed the illicit activity described herein.  Pursuant to the Audit Committee Charter, meetings of

4    the Committee are at least once each quarter or more frequently, as determined appropriate by the

5    Committee.  Thus, the Audit Committee undoubtedly met during the Relevant Period, including the

6    time between the IPO and Secondary Offering, and between the Secondary Offering and the issuance

7    of the false and misleading 2015 10-K.  Therefore, defendants Murray and Paisley face a substantial

8    likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

9    169.    Defendants Park, Friedman, Callaghan, Murray and Paisley (a majority of the Board)

10   each signed (or authorized the signing of) the false and misleading 2015 10-K, the false and

11   misleading IPO Registration Statement, and the false and misleading Secondary Offering Registration

12   Statement.  The 2015 10-K, the IPO Registration Statement and the Secondary Offering Registration

13   Statement, signed and authorized by defendants Park, Friedman, Callaghan, Murray and Paisley, were

14   false and misleading because they failed to disclose (among other things), that Fitbit's heart-rate

15   tracking devices were frequently inaccurate and were particularly inaccurate during high intensity

16   activities.   In the Securities Order, Judge Illston specifically found that statements in the IPO

17   Prospectus and Secondary Offering Prospectus (which were contained in the IPO Registration

18   Statement and Secondary Offering Registration Statement, respectively) were false and misleading.

19   As a result, defendants Park, Friedman, Callaghan, Murray and Paisley (a majority of the Board) each

20   face a substantial likelihood of liability for their actions described herein, rendering any demand upon

21   them futile.

**COUNT I**
**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES**

170.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

171.    As alleged in detail herein, each of the Defendants (and particularly the Audit

Committee Defendants) had a duty to ensure that Fitbit disseminated accurate, truthful and complete

- 44 -

information to its shareholders.

172.     Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Fitbit shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

173.     As alleged herein, each of the Defendants had a fiduciary duty to, among other things, ensure that the Company was operated in a lawful manner and to exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

174.     Defendants willfully ignored the obvious and pervasive problems with Fitbit's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

175.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Fitbit, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing Fitbit to misrepresent material facts regarding its products, business practices, financial position and business prospects.

176.     Defendants had a duty to Fitbit and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Fitbit.

177.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Fitbit in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Fitbit's affairs and in the use and preservation of Fitbit's assets.

178.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Fitbit to engage in the scheme complained of herein which they knew had an unreasonable

risk of damage to Fitbit, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Fitbit.

179.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

180.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

181.    Plaintiff, on behalf of Fitbit, has no adequate remedy at law.

**COUNT II**
**AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT**

182.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

183.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Fitbit in the form of salaries, bonuses, and other forms of compensation.

184.    Plaintiff, as a shareholder and representative of Fitbit, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**COUNT III**
**AGAINST DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934**

185.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

186.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.  Specifically, the 2016 Proxy violated §14(a) and Rule 14a-9 because it omitted material facts regarding the Company's operations and future prospects.

187.    The 2016 Proxy was false and misleading because among other things, Defendants failed to disclose that the Company's devices incorrectly measured heart rate by an average of 20 beats per minute during moderate to high exercise and in fact did not accurately measure a user's heart rate, particularly during moderate to high intensity exercise, and could be used to provide a meaningful estimate of a user's heart rate.  This was a component of the Company's core operations, and the omission of this material information rendered the 2016 Proxy false and misleading.

188.    Additionally, even though the 2016 Proxy sought shareholder votes for, *inter alia*, director nominations and a long-term executive compensation program, it failed to disclose that the Company's internal controls were not sufficient.

189.    In the exercise of reasonable care, Defendants should have known that the statements contained in the 2016 Proxy were materially false and misleading, and/or that the 2016 Proxy omitted material information.   The Company was damaged as a result of Defendants' material misrepresentations and omissions in the 2016 Proxy.

**COUNT IV**
**AGAINST THE INSIDER SELLING DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION**

190.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191.    At the time of the stock sales set forth herein, the Insider Selling Defendants were in possession of material, adverse, non-public information described above, and sold Fitbit common stock on the basis of such information.

192.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Fitbit common stock.

193.    At the time of their stock sales, the Insider Selling Defendants knew about the direction the Company would head when the truth about its devices was revealed, and the negative financial impact that would ultimately have on the Company (and its stock price).  The Insider Selling

1 Defendants' sales of Fitbit common stock while in possession and control of this material adverse,

2 non-public information was a breach of their fiduciary duties of loyalty and good faith.

3      194.     Since the use of the Company's proprietary information for their own gain constitutes

4 a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition

5 of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

6 <center>**PRAYER FOR RELIEF**</center>

7      WHEREFORE, Plaintiff demands judgment as follows:

8      A.     Against all Defendants and in favor of the Company for the amount of damages

9 sustained by the Company as a result of Defendants' breaches of fiduciary duties;

10      B.     Directing Fitbit to take all necessary actions to reform and improve its corporate

11 governance and internal procedures to comply with applicable laws and to protect the Company and

12 its shareholders from a repeat of the damaging events described herein, including, but not limited to,

13 putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or

14 Articles of Incorporation and taking such other action as may be necessary to place before

15 shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop

16 and implement procedures for greater shareholder input into the policies and guidelines of the Board;

17

18      C.     Awarding to Fitbit restitution from Defendants, and each of them, and ordering

19 disgorgement of all profits, benefits and other compensation obtained by the Defendants;

20      D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable

21 attorneys' fees, accountants' and experts' fees, costs, and expenses; and

22      E.     Granting such other and further relief as the Court deems just and proper.

23 <center>**JURY DEMAND**</center>

24      Plaintiff demands a trial by jury.

25 //

26 //

27 //

28

<center>- 48 -</center>

1   DATED: NOVEMBER 11, 2016                    **BRODSKY & SMITH, LLC**

2

3

4                                              EVAN J. SMITH (SBN 242352)
                                               esmith@brodskysmith.com
5                                              RYAN P. CARDONA (SBN 302113)
                                               rcardona@brodskysmith.com
6                                              9595 Wilshire Blvd.
                                               Beverly Hills, CA 90212
7                                              Telephone: (877) 534-2590
                                               Facsimile: (310) 247-0160

8                                              **PROFY        PROMISLOFF       &
                                               CIARLANTO, P.C.**
9                                              JOSEPH M. PROFY
                                               DAVID M. PROMISLOFF
10                                             JEFFREY. J. CIARLANTO
                                               100 N. 22nd Street, Unit 105
11                                             Philadelphia, PA 19103
                                               Telephone: (215) 259-5156
12                                             Facsimile: (215) 600-2642

13                                             **LAW   OFFICE   OF   ALFRED   G.
                                               YATES, JR., P.C.**
14                                             ALFRED G. YATES, JR.
                                               GERALD L. RUTLEDGE
15                                             519 Allegheny Building
                                               429 Forbes Avenue
16                                             Pittsburgh, PA 15219
                                               Phone: (412) 391-5164
17                                             Fax: (412) 471-1033

18                                             *Attorneys for Plaintiff Charles Blackburn*

19

20

21

22

23

24

25

26

27

28
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST
ENRICHMENT AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934